THE LAW OFFICE OF
# FREDERICK M. OBERLANDER, p.c.

28 SYCAMORE LANE, P.O. BOX 1870
MONTAUK, NEW YORK 11954

212.826.0357 T
212.202.7624 F
FRED55@AOL.COM

March 9, 2017

The Hon. Victor J. Wolski
Court of Federal Claims
Washington, D.C.

**Re:**    *Gottdiener v. United States*, 15-cv-1245

Dear Judge Wolski:

Thank you for granting leave to submit a supplemental brief. Recent events compel it, and it is easier for me to directly address the court by this letter form rather than formal brief. If the court will indulge me, I will soon make clear why I *must* address it directly.

## Background (As a Taking) Before These Events

I pled here in behalf of my clients that Felix Sater's racketeering conviction and their $7 million loss to the organized criminal scheme he was convicted of operating created their entitlement to non-discretionary benefits, *viz.* sentencing orders of restitution against him recordable as judgment liens, and rights to sue for same, each protectible property.

Besides the statutory (entitlement or exaction) claim that I pled in the alternate, in the main I pled that the concealment of that conviction, and the concealment of his criminal case and sentencing, were the methods and means of a Fifth Amendment taking of that benefit, lawfully done for the public purpose of paying Sater to cooperate by letting him keep the money he had stolen (a third-party transfer, like *Kelo*, though there would be no analytical difference if deemed a destruction of the lien), in a covert system operated by prosecutors and the courts to, instead of returning it to them, use victims' money to pay the criminals who stole it to plead guilty and work for the government.

Abstractly then, I pled that my clients suffered a compensable property loss when the executive and the judiciary, acting in authorized concert, captured a non-discretionary property benefit due my clients and *took it*, diverting it to a third party for a public purpose, and that the government accomplished this by hiding from my clients a material fact (Sater's conviction) giving rise to, and hiding the resulting existence of, that benefit, despite a duty to disclose it, then hiding its capture and diversion until, by the time my clients learned the truth, it was too late for them to do anything to stop their loss.

To prevail on that taking claim, at least two things would have to be shown: (1) the acts would have to have been authorized; and (2) the concealments would have to have been effective. And I pled that those acts had been authorized, and that my clients did not discover and could not have discovered the hidden material fact of Sater's conviction.

## The *Kriss* Ruling

On December 2, 2016, after submission of the government's motion to dismiss here, a Southern District of New York court unexpectedly held that, assuming jurisdictional predicates, one who endeavored to (or succeeded in) obtaining property by hiding *that same material fact of Sater's conviction* in the face of a duty to disclose it committed mail or wire fraud and, if they did it repeatedly by the operation of an enterprise, committed racketeering, and one who knew of and facilitated it committed racketeering conspiracy.

That case, *Kriss*[1], had been filed in 2010 by partners of Bayrock, a New York developer. They had claimed that Sater had infiltrated the firm, eventually, and covertly, owning and controlling 62% of it, while hiding his conviction from the firm and his partners, then leveraged the concealment of his conviction into a billion-dollar operation financed by investments, loans, and deals it would not have had but for that concealment

In sum, they alleged that Sater, long affiliated with Russian organized crime, and others had operated Bayrock as a racketeering enterprise with the primary objective of hiding his ownership and control and his conviction so he could perpetrate such bank fraud.

The case was kept secret for years because Sater, while an international criminal with a secret federal record, was a cooperating witness and, though we now know they had made his conviction and cooperation public years before, the Department of Justice and the judiciary in the Eastern District of New York were apoplectic that I had exposed that they had let Sater commit these crimes while supervised by Probation Services and so liable to arrest if he violated his cooperation agreement, which prohibited criminal acts.

In time, with its infusions of blood money capital from Russian Mafiya sources, Bayrock was able to attract hundreds of millions of dollars of bank loans (perpetrating hundreds of millions of dollars of bank fraud by hiding Sater's conviction and ownership) because it had for most of its existence partnered with another, rather more famous developer, who has claimed, publicly *and under oath*, n.3, that he, too, had failed to find Sater's conviction despite his self-professed formidable ability to do background checks.

On January 20, 2017, this partner of Bayrock and Sater became even more famous when he was sworn in as the 45th President of the United States, Donald Trump.

---

[1] *Kriss v. Bayrock Group LLC*, 10-cv-3959 (SDNY). The ruling is at Exh. at pg. 26 *et passim*.

By itself that election would merely prompt a letter to the government suggesting they withdraw their claim that my clients, 90-year-old Holocaust survivors, not billionaires employing ex-FBI agents in their private security forces, should have been able to figure out the truth about Sater, lest an evidentiary hearing to determine the matter (which is, if at all, a matter of *factual* dispute) entitle us to compel by subpoena a sitting president to testify that really, despite his resources he hadn't been able to learn of the conviction.[2]

(Presumably Trump would not suddenly recall he had known of the conviction all along; statutes of limitations for mail and wire fraud affecting financial institutions, and bank fraud and racketeering involving bank fraud, are 10 years, leaving all who participated in the operation of Bayrock by those frauds, or knew of and facilitated it, criminally exposed, and Trump did receive tens of millions of dollars while partnered with Bayrock).[3]

But there is far more import to these events, if that's even possible. The *Kriss* court's ruling came in its denial of motions to dismiss filed by Sater and other defendants there. It was interlocutory (though Sater appealed it anyway, since withdrawing it, and moved for reconsideration, currently *sub judice*). It was a clear ruling that plaintiffs, in their current amended pleading and all the way back to their initial complaint, had well-pled in civil racketeering, thus well-pled in criminal racketeering, by alleging that where defendants (there, partners who were fiduciaries) had a duty to disclose the fact of Sater's conviction to plaintiffs, (there, plaintiff partners), the failure to do so to induce plaintiffs to contribute their services by concealing the material truth was, assuming jurisdictional predicate, wire or mail fraud, thus a racketeering predicate.

So what are we to make, given that ruling, of what happened to my clients? If my clients had been mere employees of Bayrock who had been deprived of the truth about Sater to get them to take their jobs, they would have been victims of criminal fraud; does it mean then that because they were deprived of the truth about Sater by the executive and the judiciary, they were the victims of criminal fraud by those government actors as well? And specifically, what does it mean for their taking claim?

---

[2] The government submitted no evidence that they, or any like them should have known, saying only that a press release had been put out 10 years before the sentencing noting Sater's conviction in a footnote; I myself put that document in my clients' complaint to show that there could be no plausible claim of necessity in the concealment, not to suggest that nonagenarians should be trolling the Internet looking for decade-old news stories, and in any event it was never "findable" online by general search engines until 2010.

[3] *See*, e.g., "Real Estate Executive With Hand in Trump Projects Rose From Tangled Past," Charles Bagli, *The New York Times*, 12/17/07 ("Mr. Trump also said he was surprised to learn of Mr. Sater's past. 'We never knew that,' he said of Mr. Sater. 'We do as much of a background check as we can on the principals. I didn't really know him very well." *Also see* the last page of this brief, from *Trump v. O'Brien*, CAM-L-545-06, deposition Dec. 19, 2007.

## Plaintiffs, by Their First Amended Complaint, Concede the Lawfulness (Really Authorization) Of the Government's Acts, and That Remains

The answer is, "*Not a thing*, except, again, to make clear the inability of the government to come in and argue that my elderly clients could or should have found what the ultimate unitary head of the government himself claimed not to have been able to find. But, before proceeding I explain why I chose to address the court in this informal manner.

Trump's involvement with Sater, and Russian criminals in general, and the concealment of Sater's case, has been all over the news, all over the world, for some time. Perhaps less, but still well, known given the daily onslaught of inquiry I'm subjected to, is the fact that the attorney who began *Kriss*, developed its theories, wrote its complaints, and discovered the facts about Sater and Trump, and their criminal consequences, was me.

Since 2010, soon joined by co-counsel Richard Lerner, after seeing the havoc wreaked on my clients (including, as two have testified under oath, threats to kill them if they "made trouble") and countless others by allowing Sater to run rampant through Bayrock while protected by the government, as another Whitey Bulger, we have opined in court filings that the pervasive, systematic concealment of cooperator crime, convictions, and sentencings to the point that victims are deprived of their rights is wrong, unethical if not criminal and, as to those in government who are culpably responsible, impeachable. That is our right, and if inconsistent with any position I advocate here for our clients, that comes with the job as a recognized and accepted part of lawyering.

But I never won a decision to that effect, or even one at all suggestive of that effect, until that ruling in *Kriss*. And though I am no longer counsel there, it is and always will be "my" case and I "won" it because I developed the theories leading to its ruling that concealments like Sater's are very serious federal crimes when made in the face of a duty to disclose and with the intent to deprive the targeted victim of property.

That said, this is not a "disclosure of *contra* authority." The *Kriss* ruling is not directly on point as to the rights and obligations of prosecutors and courts, and is not binding on this court, or even the *Kriss* court, as, though law of the case, it is not a final judgment.[4]

I simply wish to accomplish two things by this disclosure. First, I wish to make clear that my clients here, these and only these clients, in this case, and only this case, do not argue that the government's actions were criminally *ultra vires* or unauthorized, and are not

---

[4] To be clear, my clients here are not in privity with the *Kriss* plaintiffs, who are in any event no longer my clients, and there is no *Tohono* issue whatsoever.

now arguing such in any other judicial forum, nor have they ever had a decision on the merits of such an argument they may have made in any other judicial forum.

And second, I wish to proceed with the ultimate candor to the court and to my opponent, so that if, for example, the government wishes to argue that its actions in the Sater case were criminally *ultra vires* based on the reasoning in *Kriss*, it can have a chance to do so.

Otherwise, if the court will indulge me for a page, I would like to clarify why I have pled this as a taking (as one, albeit primary, theory of recovery) instead of a substantive claim.

The jurisdiction of this court is limited to, as relevant here, claims "founded either upon the Constitution, or any act of Congress."[5] Typical claims in the latter category include demands for payment pursuant to some non-discretionary money-mandating statute; tax refund claims; and illegal exaction claims.

Suppose Congress passed a statute directing the Treasury to hold a random drawing of 1,000 Social Security numbers each time any NOAA radio buoy floating at sea recorded sustained winds in excess of some threshold value and then send each of those persons $20,000. We may safely assume that most persons would have no idea, at least most of the time, when such a wind event occurred.

If such drawing occurs and all the winners are notified but for some reason Treasury won't pay the $20,000 to one or more of them, there can be no question that this court would have jurisdiction to hear a suit by one of those deprived as the statute was clearly money-mandating. (It's worth noting that this is the exact equivalent of an exaction with a money-mandating statute if we imagine that instead of paying out $20,000 the statute directed the Treasury to reduce the income tax liability of each winner by that amount and then refund it to them; there should be no analytical distinction between a refund claim and a substantive unpaid benefit claim.)

Now assume that Justice is short of money in its cooperator fund, which is used to pay cooperators for their "services" (but not, of course, for their testimony) and so from time to time representatives of Treasury, Justice, and Commerce appear before a secret, *ex parte* district court proceeding and ask the court for, and obtain, an order directing that a certain already-completed drawing shall be kept secret from the persons whose numbers had already been picked and also directing that the $20,000,000 which should be paid out to the lucky 1,000 winners should instead be paid to the cooperator fund.

If we assume that this purposeful capture and diversion of that sum (notice the example doesn't say whether it was the "payment" or "refund" scenario, as the analysis again is and must be identical in either case) was authorized, not *ultra vires*, I submit that this

---

[5] 28 U.S.C. § 1491(a)(1).

has then become a taking (even if it may still be pled as a plain vanilla substantive or exaction claim) because of the addition of the authorized capture of that money and diversion to a third party, as in *Kelo*, for the public purpose of encouraging cooperation).

Is there any doubt it would be a taking if instead the government waited until the checks were sent out and cashed and then took the money from all the accounts by ACH debit?

To review, the Mandatory Victim Restitution Act requires (with limited exception) federal district courts to impose sentencing orders of restitution on convicted defendants in favor of their victims[6] and allows those victims to record such orders as judgment liens in any state.[7] Case law holds that such liens are property for takings purposes.[8]

For the same crimes, the Crime Victim Rights Act (1) lets victims to be heard at public sentencings; (2) allows them to petition the sentencing court, and sue it by mandamus, to get orders of restitution if for whatever reason the court does not impose them; (3) *requires prosecutors to find all the victims and tell them of the case and of these, and other, rights*; and (4) requires the sentencing court to ensure that the prosecutors comply.[9]

My clients are victims of an MVRA crime. They lost $7 million to a criminal scheme, a stock fraud.  They should have been, but were not, given orders of restitution, or the opportunity to sue for them, against Sater, convicted of running the scheme, so their rights to a recordable judgment lien and to sue for it were handed over to him, or extinguished in his behalf, either way, quite effectively because his case, including his sentencing (which I pled had been held in open court), had been hidden from them despite the statutory duties of (1) the executive to tell them and (2) the court to make sure it did.

I submit that, assuming the coordinated activities of the executive and the judiciary were authorized, which does not at all require that they be lawful[10], and which in this case

---

[6] 18 U.S.C. § 3663A.

[7] 18 U.S.C. § 3664(m)(1)(B).

[8] *1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252 (CA2 2014).

[9] 18 U.S.C. § 3771.

[10] "In holding that *ultra vires* conduct cannot give rise to a Fifth Amendment taking, the courts have drawn an important distinction between conduct that is "unauthorized" and conduct that is authorized but nonetheless unlawful. **Merely because a government agent's conduct is unlawful does not mean that it is unauthorized; a government official may act within his authority even if his conduct is later determined to have been contrary to law**.…As Judge (now Justice) Scalia explained for the panel in *Ramirez de Arellano v. Weinberger*… **"the mere fact that a government officer has acted illegally does not mean he has exceeded his authority for Tucker Act purposes, even though he is not 'authorized' to break the law.'"** *Del-Rio Drilling Programs v. U.S.*, 146 F.3d 1358 (Fed. Cir. 1998) (emphasis added, citations omitted).

resulted in a capture and diversion of my clients' property (the judgment lien restitution order, the right to receive it, and the right to sue for it) to or for the benefit of a third party (Sater) for a public purpose, is a taking.

I have one final observation on the taking issue. In the tradition of cases after *Stop the Beach*, I have pled a judicial taking, albeit a joint executive-judicial taking. With respect, while the presence of the judiciary in the present scenario (or in the NOAA weather buoy hypotheticals) may well run to authorization *vel non*, if the involvement of the judiciary in that which, were it done by the executive alone would surely be a taking, somehow make the taking non-compensable, then that means the government can skirt its Fifth Amendment obligation to pay just compensation simply by the expedience of getting a judge to join in and stamp something as "so-ordered."

I submit that this is not the intent of the Framers, and I submit that the constitution bars all uncompensated taking, regardless of the branch(es) of government involved.

## A Clarification of Plaintiffs' Illegal Exaction Claim

If I may be permitted, working through the above has made me realize that the "mirror-image" illegal exaction claim I pled was not necessarily a model of clarity. Now, since the basis for the argument is and remains that the government has my client's property and has to pay it back because of a controlling money-mandating statute, this is not new argument, rather new phrasing, but I assure the court I am happy to allow my opponent any reasonable chance to reply to it if she wishes.

As I pled, and briefed in opposition, typically a taking claim is pled along with an illegal exaction claim, which (assuming the government actually has the stuff) succeeds or fails on the presence or absence of some money-mandating substantive law without regard to whether the government's action was for a public purpose.

However, reflecting on the point made previously, that there is no analytical distinction between a demand for compensation for money taken or held by the misapplication of a statute and a demand for compensation for a benefit not paid out in the presence of a statute mandating that it be paid out, I wish to clarify my argument.

The property (whether considered that which was taken or that which should have been but was not paid out as a benefit) here includes an order of restitution; the judgment lien it becomes by the merely ministerial act of recordation; and the chose in action to sue to get same and to appeal by writ of mandamus if necessary to make it "work."

This is so by the joint application of the CVRA and MVRA, but, except for the chose in action, *that property is not provided by the CVRA, but by the MVRA*. It is the MVRA which mandated that my clients be given the order of restitution, not the CVRA. And with respect to an order of restitution, the MVRA is "money"-mandating, or at least "property"-mandating (semble that there is no analytical distinction in this field between a substantive law requiring the government to pay out some "thing" [aka property] and a substantive law requiring the government to pay out money).

Thus, to the extent other cases in this court (I am aware of no case in the Federal Circuit to have reached the issue directly on the merits) hold that the CVRA is, at least in some sense, not money-mandating, they are irrelevant and perhaps incompetently argued.

They are irrelevant because they never considered the question whether the CVRA was "property"-mandating (perhaps "res"-mandating is better) with respect to the right to sue for a restitution order, and they are, if this is not unduly harsh, incompetently argued insofar as, again, the CVRA is not the source of the right to restitution.

I briefed this in opposition, in a section describing the development of the victims' rights laws over time, so again this is not new. But in closing I would like to walk through the MVRA to show why it is, indeed, money-mandating, following the *Hoch* tests.

First, *Hoch* may not even apply, as the MVRA language is as mandatory as possible:

> **Notwithstanding any other provision of law**, when sentencing a defendant convicted of an offense described in subsection (c), the court **shall** order, in addition to, or in the case of a misdemeanor, in addition to or in lieu of, any other penalty authorized by law, that the defendant make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate.[11]

But, even if *Hoch* applies, all its tests are passed with ease. First, there is a sum certain:

> The order of restitution **shall** require that such defendant— in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense—**pay an amount equal to**—the greater of— the value of the property on the date of the damage, loss, or destruction; or the value of the property on the date of sentencing, less the value (as of the date the property is returned) of any part of the property that is returned;[12]

---

[11] 18 U.S.C. § 3663A(a)(1) (emph. add.)
[12] 18 U.S.C. § 3663A(b)(1) (emph. add.)

Third, while there appears to be discretionary language in the companion statute, which provides procedural rules for the imposition of an order of restitution:

> If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.[13]

That is illusory in this case, were only Sater was being sentenced and so the court had no discretion to award less than 100% of plaintiffs' losses as at the time they had received no orders of restitution against any other participant in the crime (nor for that matter had any other victim, to my best knowledge).

Fourth, the provision of the MVRA that allows a court to decline to order restitution not only requires that the situation meet specific, defined criteria of complexity, and so is not discretionary in the sense of, typically, an agency allowed to award anything or nothing, but more important, the record in Sater's case, including the docket and the sentencing transcript, confirm that the sentencing judge (Glasser, J.) made no such findings and without such findings this section could not possibly have been triggered:

> This section shall not apply...**if the court finds, from facts on the record**, that— the number of identifiable victims is so large as to make restitution impracticable; or determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.[14]

Finally, the language in the CVRA that says nothing in its chapter shall be deemed to create a right of action is not relevant because (1) the CVRA is in Chapter 237 of Title 18, while the MVRA is in Chapter 232; and (2) again, the MVRA begins with the operative language, *supra*, that its provisions control without regard to any other law.

*****

I certify under penalty of perjury pursuant to 28 U.S.C. § 1746 that all facts herein stated as true are to the best of my knowledge true and that the quarter-page excerpt from the Trump deposition is a true and correct copy of exactly that which it is represented to be.

---

[13] 18 U.S.C. § 3664(h).
[14] 18 U.S.C. § 3663A(c)(3) (emph. add.)

I certify under penalty of perjury that the word count in this document, as shown by MS-WORD 2016, is 4059 from the beginning of the substantive text to its end, and that this would exactly cover 11 pages of 12-point, double-spaced Times New Roman typeface, with standard one-inch margins, as is shown below, so is little more than half of the maximum length of a reply brief pursuant to the RCFC.

I certify under penalty of perjury that the appended errata sheet has a true and complete list of all the orthographic and grammatical changes made in this corrected version.

March 9, 2017
March 10, 2017 (as corrected)
Montauk, New York

/s/ Frederick M. Oberlander

THE LAW OFFICE OF

FREDERICK M. OBERLANDER, P.C.

28 SYCAMORE LANE, P.O. BOX 1870
MONTAUK, NEW YORK 11954
212.826.0357 T
212.202.7624 F
FRED55@AOL.COM



**ERRATA**

<u>**Page 1**</u>

Changed "were methods and means" to "were the methods and means"

<u>**Page 2**</u>

Changed "racketeering" to "committed racketeering"

Deleted "would have"

Changed "while liable to arrest" to "and so liable to arrest"

Changed "that is, by perpetrating" to "perpetrating"

<u>**Page 3**</u>

Changed "which is if at all" to "which is, if at all,"

Changed "is ten years" to "are ten years"

Changed "all back to" to "all the way back to"

<u>**Page 4**</u>

Changed "two testified under oath" to "two have testified under oath"

Changed "systematic" to "pervasive, systematic"

Changed "this case" to "and only this case"

<u>**Page 5**</u>

Changed "ultra vires" to "*ultra vires*"

Changed "paying $20,000" to "paying out $20,000"

Changed "victim fund" to "cooperator fund"

<u>**Page 8**</u>

Changed "semble there" to "semble that there"

Changed "pay an amount equal to" to "**pay an amount equal to**"

<u>**Page 9**</u>

Changed "supra" to "*supra*"

410

1       Donald J. Trump - Confidential
2   it. It would have been sold out immediately. Now
3   the market is much different in Phoenix. That's
4   why I don't even know if I want to do it.
5       Q.   Let's go back to Bayrock, Mr. Trump.
6   Are you aware that one of the principals of
7   Bayrock has previously been convicted of both
8   assault and securities fraud violations?
9       MR. RESSLER: Objection to the form of
10      the question.
11      A.   Well, they represented to me that he's
12  not a principal.
13      Q.   What's the name of this individual?
14      A.   Felix Sater.
15      Q.   And what is his position with Bayrock?
16      A.   Bayrock told me he's not a principal;
17  he's an employee. I don't know that. I don't own
18  Bayrock. But they represented to me that he is
19  a — he is an employee of the firm.
20      Q.   Who represented to that you?
21      A.   The owner of the firm.
22      Q.   Who is that?
23      A.   Tevfik — the last name — Tevfik.
24      Q.   You don't know his last name?
25      A.   His last name is Tevfik Aziz

411

1       Donald J. Trump - Confidential
2   [phonetic].
3       Q.   Aziz.
4   Did Mr. Aziz — when did Mr. Aziz tell
5   you he was not a principal?
6       A.   They did a story recently in The New
7   York Times, and I called him. I said, Is this man
8   a principal? Is he not a principal? Because I
9   was very surprised to see the story, to be honest,
10  or hear the story was about to be written and
11  ultimately read the story. And he said that — he
12  told me that he was not a principal in the firm.
13      Q.   Were you aware of this person's — I'm
14  sorry, what kind of interaction did you have with
15  Mr. Sater prior to the article appearing?
16      A.   Not that much, not very much. I dealt
17  mostly with Tevfik. I would say that my
18  interaction with Felix Sater was, you know, not —
19  was very little.
20      Q.   How many employees does Bayrock have?
21      A.   Quite a few. I don't — I can't count
22  them. I'm not — I'm not sure I've ever been in
23  their office. But — I don't know. You'd have to
24  ask them.
25      Q.   How many of their employees have you

412

1       Donald J. Trump - Confidential
2   had interactions with?
3       A.   Mostly with Tevfik.
4       Q.   And you've had interactions with
5   Mr. Sater, correct?
6       A.   Yes, limited, but yes. And also
7   Julius. There's two or three employees that I
8   know by first name. But I would say Tevfik,
9   Julius, and a little bit with Felix.
10      Q.   Have you severed your ties with the
11  Bayrock group as a result of this?
12      MR. RESSLER: Objection to the form of
13      the question.
14      You can answer.
15      A.   Well, I'm looking into it because I
16  wasn't happy with the story. So I am looking into
17  it. And again, it was told that he was an
18  employee. It was also said that nobody knows
19  anything about this guy. And even a lot of other
20  people that were trying to find things out — he
21  changed his name, the spelling of his name,
22  et cetera, et cetera. So people that were trying
23  to find things out about him have been unable to.
24      And you could say things like that
25  happen. Things like that happen. But it's

413

1       Donald J. Trump - Confidential
2   unfortunate. It's unfortunate for him, and it's
3   unfortunate for Bayrock. But Bayrock told me he's
4   not a principal of the company.
5       Q.   Is he going to continue to be
6   associated with Bayrock?
7       A.   That you would have to ask Bayrock. I
8   have a feeling no. But you really would have to
9   ask Tevfik.
10      Q.   Will you continue to be associated with
11  Bayrock if they continue him as an employee?
12      MR. RESSLER: Objection to the form of
13      the question.
14      A.   Actually I haven't thought of it,
15  because I think they're taking action, and we'll
16  see. But I will — I will let you know that
17  somewhere later down the line. I'll have to see
18  what action they take.
19      Q.   Have you previously associated with
20  people who you knew were members of organized
21  crime?
22      MR. RESSLER: Objection to the form of
23      the question.
24      A.   No, I haven't. And frankly, from what
25  I see, this person was not jailed. Nobody knew