**PLAINTIFF'S MOTION FOR JURISDICTIONAL DISCOVERY**

**PROLEGOMENA ZU JEDEM ZUKÜNFTIGEN RECHTSSYSTEM, DAS SICH ALS AUF WISSENSCHAFT UND VERNUNFT BASIEREND AUSGEBEN WIRD**
(TO ANY FUTURE LEGAL SYSTEM THAT WOULD PRESENT ITSELF AS BASED ON SCIENCE AND REASON)

**DIABEBAIŌSIS TĒS PATRŌAS ARETĒS**
(ATTORNEY AFFIRMATION IN RESPECT OF ANCESTRAL VIRTUE)

Cicero began argument by what Quintilian later called *captatio benevolentiae* to elicit the Court's goodwill, establishing *ethos*, credibility he knew was essential, using Aristotle's pillars of persuasion, and *pathos*, emotional connection. But to do that would be artifice, and this case has no room for artifice. It is too important. And while this Court must have had many briefs of contextual purpose which read as more chaos than strategy, this one is not about hidden structure, but the destruction it wreaks, financial or emotional.

Had he foreseen Rome's coming cataclysm, Cicero would have broken all his stylistic and forensic rules to warn them. He *already* had, almost, in *Philippics*, where his style degenerates into a hybrid of invective, prayer, and near-prophetic denunciation. Even there, he held structure. Why? He still believed in the Republic's ability to correct itself, still thought *mos maiorum*, ancestral virtue, could restrain Antony. Had he known that collapse of the Republic by *Lex Titia*, a Second Triumvirate, and proscription were near, and Brutus pretext for empire, not cure, he would have *abandoned structure itself*, to help preserve what it had been built to protect. He was the *magister* of his rhetorical form, not its *servus*. As am I *magister* of mine and so now repay him on top of the respect of history by giving him a second chance to sound the alarum here, for us.

Μὴ λέγε τοῖς Λακεδαιμονίοις ὅτι τὸ ἔθος παρέβην·
ἀλλὰ λέγε ὅτι αὐτὸν ἐτελέσσα.

SO, DO NOT TELL THE SPARTANS THAT I BROKE THE PHALANX OF TRADITION;
RATHER, TELL THEM THAT BY BREAKING IT, I FULFILLED IT.

The American in me says, "truth compels this"; the Prussian, "as does honor"; the lawyer, "as do duty to clients, court, *and law*." I end this part as would Demosthenes: "It is usual to now state relief requested; so I ask in humility, *"Does this Court remember what relief is, is it still uncorrupted by the times."* It is not insult, but rhetorical self-test, calibrating *judicial strategic empathy*, gently asking the Court to search within itself, see is it still part of *law* or without knowing has become but part of *procedure. That's the ask*.

**PLAINTIFF'S MOTION FOR JURISDICTIONAL DISCOVERY**

I emphasize that my aim is not to challenge your perspective, but engage with it, align my argument with the principled approach you have shown in my time here. I do this to ease the process of inquiry, not to confront but to illuminate. When I ask, "Does the Court remember what a remedy is?" I mean not to offend, but to calibrate as a craftsman sharpens a tool to match the precision to the task. The question is not a critique, but an invitation to reflect in shared pursuit of clarity and justice. You see, mental and systemic barriers like cognitive dissonance and reaction formation, can arise in such discussions, not uniquely to Your Honor but universally as challenges in all thought. To sidestep these obstacles, I present my argument in a way I hope complements your reasoning, rather than colliding with it, my approach founded on strategic empathy, understanding structures of thought and logic this Court has built, and working with them to reveal insights that serve the broader integrity of the legal system. I trust this calibration will resonate and invite the kind of systemic clarity we are all striving toward.

My father captured an SS officer in WWII. A sergeant in Patton's Army, he and his squad found the man, in a black uniform they'd not seen before, hiding from them. He surrendered; my father took his compass as a prize, dropped him at a collection center, and then got back in the war. Like most GIs, he had no idea what the SS was. Later, liberating Buchenwald, he found out. But though he came home in 1945 and I came along in 1955, I knew none of this till he told me in 1995. I played with that compass as a boy, took it to show and tell, but as my father hadn't known the truth at first, neither had I, so I never saw the blood on it. And though it's 30 years since he told me, I still see his face, 70 but 20 again, transported back to the camp when he told of the bodies. The stench. The living who envied the dead. Then he got cold. Color left his face as, staring at some never-forgotten horror only he could see, he said, "If I'd known when I found him, I don't know what would have happened."

Maybe that's the point. Had he known, put a bullet in the man's brain, nothing would have happened to him…really? He lived for 20,000 days after that encounter. In how many would he have died? In how many nights would he wake, screaming, at what he'd done, and if none, what would it suggest about his grievous loss of empathy. The point is, while no one should be judged *in extremis*, maybe someone, perhaps fate, was looking out for him knowing that being shown too much too soon can kill as well as any bullet.

## PLAINTIFF'S MOTION FOR JURISDICTIONAL DISCOVERY

**TO EACH, THERE COMES A MOMENT WHEN THEY ARE TAPPED ON THE SHOULDER AND OFFERED THE CHANCE TO DO A SPECIAL THING, UNIQUE TO THEIR TALENTS. WHAT A TRAGEDY IF THAT MOMENT FINDS THEM UNPREPARED FOR THAT WHICH COULD HAVE BEEN THEIR FINEST HOUR.**

If I may make one last point, again if it seemed that I was hyperbolically stating that this case matters, I hope Your Honor handles it properly, it would be more than offensive as for one thing this case is one of the if not the most important strategic rights litigations in constitutional history. If anything that is understatement, not hyperbole. For another, one need not believe Jung's synchronicity to ask, "Why here, why now, why us?" and I wished to encourage that it be answered, "because *fate is the hunter*."

A relentless hunter stalking prey, not a passive stream of events. Personified as moving softly in the shadows of our lives, waiting patiently until striking without warning, our choices, our acts, while seeming free, continually pursued and eventually subsumed by this inexorable force, life a dance between our attempts to carve our own path and an ever-watchful destiny that claims each moment with cold inevitability. To see the truly melancholic beauty in knowing that fate hunts us can be a call to live with heightened awareness and purpose, for each step we take is our own and part of a grand preordained narrative, recalling the ancient tension between free will and determinism, a reminder that as we assert individuality, we remain within the ambit of a larger, inexorable design. My prose was an invitation to acknowledge destiny's dual role as adversary and guide, a silent force leaving its mark on our lives, forcing us to confront a bittersweet truth: we strive for autonomy but ultimately dance to a tune of unyielding cosmic rhythm.

If I may continue, why were those five on the bridge at San Luis Rey? Chance? Need? To grasp, let alone avert, the existential crisis I lay bare herein, we will grapple with this question: *Is there an underlying structure that can explain all this, or only chaos and futility?* Like Brother Juniper, we will do the work and find that what patterns are there suggest transcendent design, deistic or not, find that in the end truth is the sole bridge between the realms of the righteous and the fallen, the only *dao* to survival and meaning.

But we don't have to wait for the end to see what it reveals as we've been shown it if we will but admit that we have, as this filing is a product of a world seen, indeed sculpted, for five thousand years by the best and brightest who all lived in societies that knew that

## PLAINTIFF'S MOTION FOR JURISDICTIONAL DISCOVERY

when dishonor is exposed, its perpetrator is, must be, shamed into disgrace. But, today, those who once would have in a just world made to suffer the torture their attempts at law sought to justify are made professors, even judges. *What happened, and why*?

That much is easy: most in power cannot let truth be shown or seen. *I've* defeated them so far; now *we'll* see if revelations *we* produce can defy the containment those persons would impose. Why it's now *we* and no longer *I* will be clear shortly.  But to do this, we must accept that *any traditional legal framework will be inadequate*. Only then can these eternal questions be answered: *What does this tell us? What lesson is to be drawn?*

If we persist, in time won't evil expose itself? So we think when young. But as we mature we come to respect evil, for time is on *its* side, and *its* audience, though it will say it wants to be free, will keep running back to the perceived safety of a bondage it will deny. So there is no choice lest that paradox be our undoing but to cross the bridge from our inadequate established legal doctrine to revelatory insight we seek, and to do that. build subordinate bridges between conventional understanding to deeper truth by framework outdating established legal landscape to map the philosophical terrain that gives it meaning, so as Brother Juniper saw pattern in randomness we see that the architecture of reality has little to do with what we call justice, even less with what we call right.

No matter, this is the bridge to which fate has brought us, our intellectual transport from a familiar shore of established legal doctrine to a new, opposite shore of revelation where truth resides. Without that bridge, the tragedy of our system will stay and we remain blind to truths that stand before us, fated to fulfill prophecies of failure we lack vision to recognize, will to overcome. Only by building and crossing this bridge can we reach recognition, make illusion fall away, reality be revealed, and do what must be done.

Seven years ago, Your Honor asked me to brief thoughts I had on methods for deciding if something is property for eminent domain. I've since progressed beyond to a solved problem, a framework which reproduces almost all recorded property law. It related,

> I spent the day with the master, listening to his ruminations about the nature of God and the universe as we walked together along the beach, after which we went home and I made him his favorite supper of crab-and-ginger soup…I return to this day often, becoming the student so I can again take this walk with the master, for of all creatures in My creation, I loved him for how close he came to understanding Me.

**PLAINTIFF'S MOTION FOR JURISDICTIONAL DISCOVERY**

I hoped to convey that Taoism, Confucianism, Mysticism;  and Christian Incarnation; see a mutual respect between student, teacher, and God, as Talmud sees *magister* and *discipulus* in cyclical wisdom and learning, roles interchanging in harmony, teaching and learning spontaneous, with no hierarchy, teachers' lessons giving knowledge to students while students' questions give understanding to teachers, reciprocity contributing to the moral and intellectual cultivation of each, evolving into interconnection.

That sounds good and *should* have the added benefit of being true, and as this case nears conclusion, I *should* express gratitude for the chance to serve, to be the best of advocates in hope my contribution was meaningful, and my outlook of value, learning immensely from the court, trusting the relationship, like any dynamic between master and student, was mutually enriching, and so thanking you for your patience, wisdom, and guidance.

But I can't: our journey has just started if it is to be the strategic rights litigation of the century, though the century has just begun. So I must for this filing be the guide. Why? Because if you've played the game perfectly and the system still refuses to act, you're not fighting corruption, but the reality that transparency, reason, and accountability have left the building and will not return unless and until we recreate them ourselves.

If it seems atypical that I accept, at least not dismiss, fate: Fifty years ago, Harlan Ellison published *Adrift Just Off the Islets of Langerhans: Latitude 38° 54' N, Longitude 77° 00' 13" W*. Its plot has Larry Talbot, cursed by his lycanthropy to live forever, ask Victor Frankenstein for help; he advises that Talbot must find and reunite with his lost human soul, which he determines to be at those coordinates. For fifty years, not one week went by when those coordinates didn't float through my mind for no reason, until I checked.

*39° N, 77° W are the coordinates of this Court. That's why it's here, and why all of us here to help: to fulfill its manifest destiny, its fate as the people's court and keeper of its conscience. Because fate is the hunter and justice must be done – no, not justice, right. It's very easy to do justice. Very hard to do right. But maybe, if we try hard, right can be done, magic can settle over us and touch a few lives, and a few pieces can fall softly into place in the jigsaw of Creation.*

**PLAINTIFF'S MOTION FOR JURISDICTIONAL DISCOVERY**

FROM A LONGER JOURNEY, AND ALL THE YEARS THAT BROUGHT ME HERE:
YOUR HONOR MAY WANT TO CATCH HIS BREATH FOR WHAT'S AHEAD…AND
USE SUNSCREEN, AS WE'LL BE BATHED IN THE DISINFECTANT OF SUNLIGHT

I lean heavily on classics because, well, they're classic. They've stood the test of time. A long time. Very long.  Any who saw *The Tudors* or *Wolf Hall* and got curious probably found a YouTube showing Henry's love letters to Anne (clearly not Cleves) and were impressed that it sounds "just like us" after 500 years. Cairenes know that at Giza most nights you can hear actors reading aloud love letters written by royalty 5,000 years ago, *ten times* as far back, and *five thousand miles away,* which might have been written today.

Among open matters before this Court are the government's 2ⁿᵈ of 3 § 12b1 motions to dismiss, for lack of jurisdiction on a theory I don't understand but which appears to be a kind of a preclusion argument that my clients sued Sater civilly in SDNY and lost so cannot have a claim for taking or exaction of restitution because "they had their one shot." I *think* it argues that, but my letterhead says "Law Office" not "Mindreading Office."  And this is crucial because if I'm correct in my reading, and I'm sure I am, even if preclusion lies in § 12b1, and it's not, this is not the 3ʳᵈ Circuit, the government has not made a *prima facie* case of a full and fair opportunity to actually, necessarily have litigated the question of my clients' MVRA/CVRA victim status. Oh, they think they have, they may actually be that limited, whoever wrote it and signed off on it, but they did not at all.  Nor could they have as by their own statements it's impossible. Yes, it's true, they're arguing there's a preclusion event that they simultaneously argue cannot exist. That alone would entitle me to ask it be denied but it would be without prejudice to renew, especially in fairness given the courtesy shown me…but that can't be because:

> ➤ *Their motion misleads the Court, likely violating the duty of candor*
> ➤ *Their motion is obstructive fraud on the court under USC § 1512(c)(2)*

Which is true is the *esse* of this case, all we know and need to know. ***Both are,*** depending on what kind of reality we see. As a tourist to New York or San Francisco who went into Chinatown might say, "I didn't even know there were *kinds* of Chinese food, Your Honor may be thinking, "*Kinds* of reality?" That's a problem: We usually take people who see a kind of reality different from ours and lock them up, at least if they're not robed, sandaled, and speaking Greek, Latin, Aramaic, or Hebrew. I've got that covered.

15-CV-01245

**PLAINTIFF'S MOTION FOR JURISDICTIONAL DISCOVERY**

But before anyone is put away, I ask rhetorically, who argues that you cannot hear a case because to do so you'd have to decide there was not full and fair opportunity there, which they say you cannot. It would mean whatever an Article III court does, you have no jurisdiction to apply constitutional requirements of due process to evaluate fairness of preclusion, facially a problem (I could use other terms) because that other court then controls your jurisdiction which is impossible because as Your Honor held in *Chisolm*, Article III courts can't decide this court's jurisdiction in a Tucker Claim, at best only in a Little Tucker Claim, which this isn't. The jurisdiction to do so is and must be *yours alone,* as would be so in reciprocal discipline, *Selling* requiring you evaluate the fairness of the other court's discipline, federal or state, as indeed this Court's own rules provide.

So how did this legally challenged document, a document that refutes itself, get filed here with DOJ signatures on it? ***No one intended it to be addressed on merit, as it has none. The government has been litigating on narrative, not evidence and law, getting away with it for 15 years in other courts, so is taking a shot here, a bullet I gladly take for this Court, as I do now although safe in knowing that it will never hit its target.***

The power of truth once lay in questioning the fabric of the world; Robin Williams said, "Reality! What a Concept!" A half-century later, ours is a brave new world where reality like truth has left the building, moved to an illusory no-go zone which looked for cannot be seen, felt for cannot be touched, listened for cannot be heard – at least not safely, lest it result in being professionally wished away to the cornfield it inhabits, never to return.

The section title, *supra*, is a for Kant, who wrote a *Prolegomena* in response to complaints that his first attempt, *Critique*, was inaccessible. As the Court will see, this filing is a maturation of one I filed some years ago, but far more advanced in a way that might seem (but is, astonishingly, *not*) more complex still. So in the interest of keeping all of us awake, let me (1) promise no more German; and (2) bring this home *now*.

Still, I *am* Prussian, we *are* from Königsberg, nearly 200 years ago, and *did* find Kant incomprehensible, he is the Western civilization father of the concept that perception of reality is inherently seen through a lens susceptible to cognitive distortions and worse pathological perception from perceptual abnormality, we pay tribute, though one would do as well to see *Caligari* for its depiction of how Cesare sees Holstenwall before cure.

**PLAINTIFF'S MOTION FOR JURISDICTIONAL DISCOVERY**

Let me explain this periphrastic frolic-and-detour. To discuss what happened here, I must urge Your Honor to adopt a certain framework against which to see it. A similar, but not equivalent term, is a narrative. Call them close cousins who often pass for twins. Why? Moral obligations of candor and a number soup of ethical rules require me to explain how *Your Honor is being played by the government*. That's the only term for it. What's the obvious reaction? "Are you suggesting the Court may be too stupid to see for itself?" "No, I'm suggesting the Court may be too trusting to see for itself." That's my job now, to get through the defense put up by the government, that's what it is, a defensive line (the government's narrative) with one job: protecting the quarterback (Your Honor) from being sacked (in its reality) by the truth, and I must "break that line" in such way that Your Honor sees what I did as what it is and then takes the ball to goal.

Another consideration: Mr. Miyagi makes Daniel paint his fence incessantly until an angry Daniel realizes he was making him train his muscles. Most of this aspect of Kant is reducible to his breakthrough understanding that we perceive reality through a lens of interpretation, perhaps switching an internal phoropter ("Better like this or this") so starting there, defining a rigid category structure of narratives and frameworks, I condition the court to handle the same concepts with different labels as tools of category theory by algebraic topology to help the Court see what's there helping to understand property in contexts of takings or exactions. It means we establish algorithmically which concepts have no "there" there and so are misuse of framework (by assumed symmetric equivalent value here) to justify *ad hoc* creations of regulatory takings and like doctrines that invert reality to say, "Well we're taking this much, no compensation necessary. so that must mean that it's the market price or FMV of the cost of living in a free society," a beautiful speech willfully or imbecilically oblivious to the fact that it's not an auction price it's a fiat price, something new in economics, *viz.* price discovery by fiat, but more, it's the same indefensible dross that justifies collateral bar, we don't allow defending against unconstitutional orders in contempt as the price we pay to live in a free society. So yes, indeed, algebraic topology allows us to see how rights. in property or not, are taken in the name of supposed greater freedom. I say it's worth the price of admission, to see rights transfers whether or not property as transfers of measure to understand optionality-based protections of core enumerated rights.

## PLAINTIFF'S MOTION FOR JURISDICTIONAL DISCOVERY

### THE ILLUSION OF RECTITUDE IS THE FIRST OF PLEASURES
### WHILE THE REALITY OF CORRUPTION IS RARELY SEEN

Oedipus thinks he's in control, a ruler solving a mystery, finding the killer of King Laius in the belief that truth is something external he can uncover with reason. But a detail won't fit. A messenger says something too familiar, its timing too perfect, and Oedipus' assumptions unravel. Suddenly, the world he thought he was in collapses, as the story was *not* about an external mystery, but about *him*. He was inside it all along, digging his own grave, believing he was getting closer to truth when truth was getting closer to him.

In *36 Hours*, an American officer is caught by Nazis in 1944, just before the Normandy invasion, drugged, and transported to a German hospital built, equipped, and staffed to look like an Allied hospital in post-war occupied Germany. Doctors and nurses speak English.  He's been treated to look and seem older. All this so he'll believe that the war has been over for years and he's been hospitalized with amnesia to get him to reveal the Allied invasion plans – *and it works*. *He does*. But then a detail won't fit. A papercut. A tiny, insignificant thing, except he remembers it had happened in Nazi-occupied France, where he really is, so would not be still fresh if he'd really been amnestic for years after. That's when he knows. Everything falls into place. The entire illusion collapses because of something so small it should have been nothing.

From *Oedipus Rex* to *36 Hours* this has been called dramatic irony: the audience knows what the protagonist does not, that he is living in illusion, not reality, building audience tension, till at theend, with reveal comes release, *catharsis*. But before *catharsis* comes something else. The Greeks had a name for the moment before the fall, before release, the instant truth is no longer possible, but certain. They called it *anagnorisis*, the point of recognition, when the protagonist realizes that what he thought was true never was.

Your Honor had it, too, I think, and knew: details didn't fit, the messenger came too soon, the cut was still fresh. It was a few years ago, in a phone conference, when I said something, Your Honor asked, "Why would…" and stopped. Hesitation. Recognition. Thought left unfinished, words left unspoken, because to finish and speak them would have meant stepping out of the illusion and into reality. That was Your Honor's time, your point of recognition, your **anagnorisis**. Something seen that can't be unseen, the world no longer behaving as expected, what had seemed routine now feeling misaligned.

## PLAINTIFF'S MOTION FOR JURISDICTIONAL DISCOVERY

In *The Sixth Sense*, it was a wedding ring that should have been on Malcolm's finger for life and, he realized, *had been*: illusion collapsed, reality no longer as it had seemed.

The same is true here. This document is not about jurisdiction, but the moment this Court recognized, I think, that *it* was inside something else all along, when I mentioned on that call that Plaintiffs wished to introduce a document written by Judge Glasser and submitted by then-Solicitor General Verilli to the Supreme Court in which he states, in **bold**, <u>underlined</u> text, that he'd sentenced Felix Sater in open court, details of his co-operation read aloud so made public property, but the document was sealed.

Your Honor interrupted to ask, "Why would Judge Glasser keep under seal the fact that he sentenced Sater in open court?" Then, I think, Your Honor saw and hasn't unseen it since: ***Judge Glasser didn't intend what had happened in that open court proceeding to be "public fact" notwithstanding that by law it had become so instantly and forever by its occurrence and by law kept such for at least a decade, no ifs, ands, or buts. NONE.***

As Your Honor might suspect, this document was crafted to openly and appropriately guide Your Honor to such place of *preparedness* as we hope is attainable, *see infra*. It takes nothing away from my appreciation of the Court's fair treatment of this case to suggest that too much "difficulty" tisks cognitive dissonance, "it couldn't happen, so didn't."

*It is lawyering to be judicious in setting forth all that happened the Court needs to know.*

*It is obstructing to try to derail a case with incoherent semi-argument based on willfully and intentionally fabricated existence of a court order unless we have degenerated to the point this is what lawyering has become, that we anticipate a future where students are not taught In Catalinam's use of praeterito or subtleties of imperfect subjunctive contrary to future fact but Six Tried and Tested Ways to Evade Making First Amendment Findings and Still Hide a Case or A Disquisition on the Null Epistemics of 'Open Court Subject to a Sealing Order' and How to Enforce It Through Criminal Contempt Notwithstanding Lack of Jurisdiction as Well as Lack of an Observable Order.*

*It is racketeering to do so at least twice in 10 years pursuant to a common scheme.*

*All of these the government has done in particular here. I request intervention.*

## PLAINTIFF'S MOTION FOR JURISDICTIONAL DISCOVERY

### DISQUISITION ON THE NATURE OF
### "OPEN COURT SUBJECT TO A SEALING ORDER"

This is from a letter brief filed June 2011 by appellee United States in 10-2905 CA2 filed by Loretta Lynch, then U.S. Attorney, EDNY, signed n her name by an AUSA:

> Roe argues that because Judge Glasser conducted an evidentiary hearing on June 21, 2010, which was open to the public, and "declined to order anyone in the court not to say who Mr. Doe is," he is free to disclose the information contained in his first request. However, Judge Glasser conducted the hearing, at least in part, to determine how Roe had obtained sealed and confidential documents in contravention of the existing sealing order. At the time of the hearing, as is true today, the case was sealed as a whole. It would prove a remarkable development if the very hearing investigating a possible breach of a court's sealing order led to the publication of facts subject to that order. It was also clear that Judge Glasser did not intend to allow Doe's identity to become a public fact as a result of the hearing. This is evidenced by his order to the court reporter at the conclusion of the hearing that any reference to Sater's name be changed to John Doe in the transcript of the proceedings.

Interestingly, the reporter actually transcribed his order to alter her official transcript:

Judge Glasser was holding hearings how I, Roe, had come to have documents of Sater's conviction and cooperation. On June 14, 2010, I politely told him I could not participate in closed proceedings without public notice and First Amendment evidentiary hearing on closure and he agreed then and each session thereafter that they would not be closed.

I testified a week later, as did Sater and my client. All knew Sater on sight. At the end Sater asked Judge Glasser to seal the session; he refused. Sater asked him to enjoin all there from saying what they'd seen and heard: his identity. He refused noting (correctly) no federal judge had power to bar disseminating what transpired in open court and had he, would not use it, but on Sater's request ordered the transcript *altered* (not redacted).

Sir, I am so sorry, but I am out of time and capacity and must recover, so: Does Your Honor see? Forgive the impertinence, but as the fate of the nation may depend on it, perhaps read it again. Do you see? None do. None. No human. No AI. That is scary. Yes, it can be ascribed to an alphabet soup of neurocognitive device, but it is scary:

### PLAINTIFF'S MOTION FOR JURISDICTIONAL DISCOVERY

That's a sitting judge, former law school dean, by his admission aware that no judge can enjoin anyone from repeating what happened in open court, so declining to seal it or order anyone not to speak, altering an official reporter's transcript with, according to the US Attorney, specific intent that what happened in open court not be public fact.

That's a court reporter acquiescing, which in a normal world would be prosecuted and she flipped to cooperate and reveal how many other times she did this.

And a US Attorney not reporting the judge to public integrity, or even finding it unusual for a judge to do that. In fact, she's telling the Second Circuit that it was no more than a way to ensure that he didn't want what had been said in open court to be "public fact." And, disused *infra*, the Second Circuit didn't disbar her or refer *her* to public integrity either: No, it affirmed, holding that the right to disseminate what was said and heard in open court was subject to, made criminal by, the "case being sealed as a whole."

Of course, in *this* reality, that would require, *inter alia*, a sealing order. Is Your Honor curious what "sealing order" did that, what it said, when it issued, against whom, with what jurisdiction, *since it is the same "sealing order" the government claims robs this Court of jurisdiction?* Of course, the government must have attached it to the 12b1, or quoted from it, or referenced its ECF entry, since it knew it was creating a jurisdictional factual dispute since our complaint says there was no order? Well, you care because this non-existent order that overrides "open court" it's the same nonexistent sealing order the government is trying to use here to derail jurisdiction in violation of 18 USC § 1512.

Before we get into the weeds on this, if I may be presumptuous, how hard could it have been for the government to find and attach it to their papers? I believe the Court can take notice without much from me that the government goes to great length to prattle on about how the sealing order does this, means that, but it doesn't have and can't find a copy? Not on any dockets? Let me ask Your Honor. I think the public narrative is that I violated that order. All over the legal and sometimes general press. So, as I was indeed "found" to have willfully and intentionally violated it, wouldn't it have been produced at my trial? They can't find it? And am I likely suicidal enough to file a complaint here and make the accusations under oath I do now that there is and was no such order after going through and losing a contempt trial, which would have required its production?

15-CV-01245

**PLAINTIFF'S MOTION FOR JURISDICTIONAL DISCOVERY**

Fed. R. Crim. Pr. § 42 would require its production, and as I was represented in the Second Circuit, which the government tells you affirmed, by First Amendment lawyer David Schulz, former Federal Judge Paul Cassell, and Richard Lerner, it would be safe to assume they'd have put the order in the Joint Appendix or made sure the government did, and it's post-2010 so on PACER; why can't the government just go online and download it? How does someone get prosecuted for contempt with no charge of what he did or what made it wrong? Yes, it could have been brought on by grand jury, possibly by federal criminal complaint, but there'd have to be detail somewhere. To say nothing of the trial or hearing record. Unless there was no charge and thus no trial. But how could there be a finding of guilt? Unless *ex parte* without process? In this country?

This began on or about May 1, 2010, when Sater obtained an OSC from Judge Glasser, with a sworn affirmation of his attorney, Kelly Moore, former EDNY, AUSA during his time there, now representing him, I say again sworn affirmation, that the case had been sealed since inception. Judge Glasser granted the OSC, and at a hearing June 11, 2010, expressed outrage that something he'd sealed in the EDNY made it into a complaint in the SDNY. So my lawyers went to the EDNY Clark asking to see the sealing order and were told no, the sealing order is itself sealed. We filed an emergency motion with Judge Glasser on June 14, 2010, asking to see that order and any other order that could have bound me. It was thorough, asking for an explanation how I could have been bound by an order issued in a case to which I had no connection, nor was alleged to have.

That same morning, Ms. Moore sent an objection asking the Court to not show me the sealing order because *we [her firm] have never seen it and don't know what it says*. ***That is not surprising because that same day, June 14, 2010, Judge Glasser responded in open court on the record that he had no evidence that he'd issued a formal sealing order that he could tell, certainly none in writing, and had never issued any order binding me.***

All this is public record now. It wasn't when I filed here. One last thing, not to bury the lede. The government cites the Second Circuit's order of June 29, 2011, as affirming Judge Glasser's sealing order. If it didn't exist in tangible recordation, which is why it's not in the Joint Appendix, *what exactly were they reviewing to affirm? More important, that Court acted in clear absence of jurisdiction in is purported affirmance. What Your Honor is perhaps feeling is* **palingnorisis** (*palin* [renewed, not Sarah] + *gnorisis* [recognition]).

15-CV-01245

## PLAINTIFF'S MOTION FOR JURISDICTIONAL DISCOVERY

### THE ENDANGERING GOVERNING DYNAMICS OF PATHOCRACY
### BY SELF-RESPONSIVE FEEDBACK EMERGENCE

- A university systematically buries sexual abuse and harassment claims to protect its reputation, marginalizing victims and penalizing whistleblowers.

- A corporate environment suppresses ethical concerns about dangerous products through bureaucracy and legal threats,compliant employees get promotions while those who speak up find their careers stall or "disappear."

- Religious organizations develop elaborate systems to conceal abuse, by which questioning becomes defined as "lack of faith" and institutional protection is soon indistinguishable from spiritual obligation.

- Professional associations' leadership circles tighten till reasonable questions are held disloyal by gradually established unwritten rules of permitted discourse.

These are examples of *pathocracy*, a system where morally, ethically, and indeed legally compromised individuals gain control. The power structures prioritize self-interest and control over societal well-being, creating systems amplifying dysfunctional values while developing increasingly sophisticated mechanisms to protect themselves from any real accountability. It does not require overt tyranny, indeed, can thrive on quiet erosions of answerability. If members mute criticism to preserve comity, they unwittingly feed its growth. Acts of tempered dissent, though rationalized as strategic restraint, instead are interpreted as signaling compliance, so the system adapts, interpreting silence as assent. Objections withheld to keep peace likewise become an invitation to deeper entrenchment; good intentions, preserving order or sparing others, are co-opted. Restraint morphs into complicity while the system evolves tools to suppress dissent entirely: surveillance, loyalty tests, coercion, until what began as prudence becomes participation.

Nor will it collapse of soft critique; rather, again, it will adapt. Only pure, untempered, principled resistance interrupts its feedback loop. Without it, self-replicating servility becomes the new norm and does not end well, if it ends at all.

This pattern bears striking resemblance to ancient Rome's system of delation, which originated in Octavian's reign but reached its nadir under Tiberius. Cooperators, what they called *delatores*, professional informants denounced fellow citizens for alleged crime, receiving portions of the condemned's property as reward. This created a climate where accusation equaled guilt, transforming political tool to revenue enhancement.

## PLAINTIFF'S MOTION FOR JURISDICTIONAL DISCOVERY

### MAY I INTRODUCE THE "FOUNDATIONAL VICTIM"

Nicholas Christopher survived 12 knife wounds, so deep paramedics asked him to hold his intestines in to carry him to the ambulance, past the pool of blood where he'd seen his mom stabbed 84 times, his sister 9 times. But he couldn't, his little hands were too small. For Nicholas was only three years old. His sister Lacie was two. Their mom, 24.

A Tennessee jury sentenced Pervis Payne to death for the murders of his mom Charisse and sister Lacie. The judge let his grandmother Mary tell the sentencing jury of the impact of the crime, how he had been affected by the murders of his mother and sister:

> He cries for his mom. He doesn't understand why she doesn't ever come home. And he cries for his sister Lacie. He comes to me all the time and asks me, "Grandma, do you miss my Lacie?" I tell him, "Yes." Then he says, "I'm worried about my Lacie."

To say he survived is misleading. What was Nicholas is 41, but it isn't him. He doesn't live there anymore, not all of him, for his psyche split by traumatic complex. The part we see, we call Nicholas, kept growing, id, ego, and superego developing harmoniously, but the part we don't see, even he doesn't see, a Nicholas-thing, stays a traumatized three-year-old feeling divided, incomplete, an unintegrated part exerting influence only subtly except in times of stress, when Nicholas decompensates and regresses into child-like behavior, retreating from his superego's distorted disapproval of the Nicholas-thing for not saving his mother and sister given his belief that he has a "special role" as a *goel haddam*, a blood avenger, but a covert, symptomatic one, convinced that the reason he survived but his mom and sister did not was because he didn't save them even though he "knows" he could have. Stuck in the past, he serves life without parole in a prison of latent survivor guilt and infantile grandiosity to which no one will ever hold a key.

For Nicholas is a victim. Not *was*. *Is*. As no one touches a hot stove and yells, "That *was* hot," but "that's hot," no one *was* a victim. It's *is*. It's always present tense because like the Nicholas-thing, it's always present. So is the Nicholas-thing a victim. Like Nicholas, he has no life, never will. But unlike Nicholas, free to go about, the Nicholas-thing can never go out in the daytime, for he lives in a prison of repression, to which no one will hold a key, only coming out at night to manifest as a nightmare where the mother he remembers read stories to him and the sister he remembers watched cartoons with him come in his dreams to die again reminding him he failed to protect them and always will.

**PLAINTIFF'S MOTION FOR JURISDICTIONAL DISCOVERY**

Your Honor can see this in a documentary, *My Lacie*, if you make it through. I had to. But these are the facts of *Payne v. Tennessee*, 501 U.S. 808 (1991), a victim's rights watershed holding impact statements admissible in sentencing, even capital cases It, and other factors, presaged the MVRA/CVRA constellation whose repudiation is among the gravamina here.

In 2015 former federal district judge, then professor of law Paul Cassell, told Congress:

> Mary's statement is heartrending but does not *unfairly* prejudice the jury, which cannot render judgment without understanding ramifications of crime. The image of reality, a three-year-old seeing the murder of his mother and sister, is essential to appreciate the harm inflicted. Victim statements give context crime is not abstract, helps juries see the harm. Victim participation at sentencing helps mend psychological harm. Denying their voice compounds trauma by creating a perception that justice prioritizes defendants over them. *Opportunity to be heard is crucial to just process, and prevents the government from compounding injury inflicted by the criminal.* That sentencing might aggravate grievous injuries suffered by victims and families must give pause before we let the justice system add government's insult to criminally inflicted injury. For this alone, victims and families no less than defendants must have so were given the indefeasible right to be heard at sentencing.

That never happened in Sater's case, though the CVRA made it such indefeasible right the executive and judiciary were *required* to enforce. To the extent that is a compensable taking or an exaction of their property or measure-equivalent rights therein, *infra*, this Court is the sole place they can get help, and to the extent those responsible obstructed paths to justice, the sole means by which to expose it. Indeed, to the extent such obstruction created its own deprivation, not only is this Court sole source of relief, it may invert the obstruction, turning it back against the obstructor itself, the United States if it its bad faith is relevant. *And it is.*

What was taken, exacted, the *base morphism*, wasn't money, but *dignity, the right to closure,* first by Sater, then the system. *Damages* are but a way to keep score. The *harm* of growing up without a mother to take you to the park and a sister to whom you will be big brother is another. *Betrayal* is learning the government and courts *required* to shield you from it secretly and dishonorably switched sides to protect the criminal, in Sater's case by facilitating his racketeering. The framing is *epistemic*, not legal or equitable, shifting from deprivation of rights to deprivation of closure obscured by materiality, transcending monetary measures as it's the true loss lingering, albeit we seek recovery of its quantifiable monetary reflection.

## PLAINTIFF'S MOTION FOR JURISDICTIONAL DISCOVERY

### PRO TEMPORE MOTION FOR JURISDICTIONAL DISCOVERY

**WHEREFORE**, the United States has moved to dismiss this proceeding on grounds set forth in the motion on or about July 2016; and

**WHEREFORE**, the United States has throughout its motion papers based opposition on a purported "sealing order" that it has neither attached, cited to, quoted from, given affidavit percipient testimony to, and cannot state its decretal terms or who it binds;

**WHEREFORE**, Plaintiffs' First Amended Compliant expressly pleads that there was no such order, only an off-the-books concealment, *infra*, conflicting with the above;

**WHEREFORE**, given all the above, evidentiary proffers *per se* and of party admission;

**THEREFORE**, upon reasonably quick completion of this filing, leave to do so hereby now requested, there shall commence the standard time to respond to this motion, as well as for all relief this Court finds just, whether in law or equity, to include a stay of all process herein other than as addresses this motion until it is so completed, *infra*.

Plaintiffs will move this Court, on all papers submitted, for an order compelling the Untied Sates to produce in admissible evidentiary form, that sealing order and as may be necessary thereafter make itself available to answer jurisdictional discovery.

*****

April 8, 2025 (corrected)

The undersigned swears at penalty of perjury that all factual representations herein are true and correct to his best knowledge based on what he percipiently learned during representation of the plaintiffs, what he has reviewed in files maintained for this and related actions and what he believes in good faith readily inferable from these same.

*****

/s/ Frederick M. Oberlander, Counsel for Plaintiffs

I, Richard E. Lerner, say at penalty of perjury, 28 US.C 1746, that I read this ifling, am percipient witness to all facts said therein *re* proceedings in EDNY and USCA2, and declare such facts are and will swear they are, to my best knowledge true and correct.

Dated: New York, New York
April 8, 2025

Richard E. Lerner

15-CV-01245